In the

# United States Court of Appeals
## For the Seventh Circuit

No. 00-3402

JAMES R. HALL, III,

*Plaintiff-Appellant,*

*v.*

GARY COMMUNITY SCHOOL CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 97 C 97—**Andrew P. Rodovich**, *Magistrate Judge.*

ARGUED SEPTEMBER 13, 2001—DECIDED AUGUST 1, 2002

Before RIPPLE, ROVNER, and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* After James Hall was discharged
from his teaching position by the Gary Community School
Corporation (GCS), he sued GCS under Title VII. 42 U.S.C.
§ 2000e *et seq.* Hall alleged that GCS terminated his em-
ployment in order to retaliate against him for filing dis-
crimination charges with the Equal Employment Oppor-
tunity Commission. A jury returned a verdict in Hall's
favor, but the district court granted GCS's post-verdict
motion for judgment as a matter of law. Hall now appeals,
and we affirm.

Hall began working for GCS in 1987 as a non-permanent
teacher and taught at a number of GCS schools until his

indefinite teacher contract was terminated in June 1996. In 1987 Hall started teaching social studies classes at Emerson Middle School. His performance evaluation from that year noted that he suffered from punctuality problems and needed improvement. The next year he was transferred to Tolleston Middle School, where he worked as an at-risk counselor. The year after that he was transferred to another teaching position at Beckman Middle School. While at Beckman, Hall continued to suffer from punctuality problems. He was disciplined and docked pay for his "frequent late arrivals," for leaving the school during the day without informing office personnel, and for not returning in time to supervise students. During this school year (1989-90) he was subsequently transferred back to Emerson. Hall's performance evaluation at the end of the year noted a number of deficiencies pertaining to his teaching performance and classroom management, and again noted a tardiness problem. The evaluation ultimately recommended that Hall's contract be renewed for the following year, but recommended that he be "closely monitored for improvement" and that his contract not be renewed again if he fails to improve.

In June 1990 Hall was transferred to Horace Mann High School. At Horace Mann, Hall's punctuality problem continued. In 1991 a disciplinary conference was held and Hall was docked pay. Later that year Hall failed to attend another disciplinary meeting and was reprimanded for "flagrant disregard for the rules and regulations." At the end of the 1991-92 school year, Hall's teaching position was eliminated and he was transferred back to Tolleston. Hall wished to remain at Horace Mann and applied for an opening to teach an economics class. GCS informed Hall that he would not be hired for that position because, even though he was licensed to teach economics, he did not have the necessary hours specified by the state accrediting agency. GCS hired a non-licensed female teacher for

the position instead. Hall then filed a charge of gender discrimination with the EEOC. Hall and GCS entered into an agreement whereby Hall would withdraw his charge and would remain at Horace Mann and teach the economics class beginning in 1993.

In April 1993 Hall filed a second EEOC charge, alleging that he was being harassed for filing his previous charge. In June GCS notified Hall that another social studies teacher was returning to Horace Mann to teach the economics class and that he was being transferred to West Side High School. Hall then amended his EEOC charge to include the transfer as part of his retaliation charge. Hall also contended that the transfer violated his settlement agreement, and asked GCS for a hearing. A hearing was held, but the decision to transfer Hall was upheld.

Hall then began teaching at West Side, and his earlier problems persisted. In January 1995 West Side school officials held a meeting with Hall to discuss his punctuality problem, poor classroom management, and poor human relations skills. A memorandum from that meeting prepared by then-Assistant Principal Jenneth Motley noted that Principal Clifton Gooden evaluated Hall's classroom on a number of recent occasions, and found deficiencies relating to classroom management, class presentations, and grading procedures, and that, despite repeated requests, Hall failed to produce his lesson plans. In addition, the memorandum noted fourteen instances in which Hall was tardy between November 1994 and January 1995, and other instances when he had left his classroom unattended. The meeting concluded with school officials offering Hall techniques to improve in the areas in which he was deficient and informing him that improvement was expected.

In March 1995 Gooden recommended to the GCS Board of Trustees that Hall's contract be terminated or that he

be suspended without pay for excessive tardiness, poor classroom management, and poor human relations skills. A hearing was held before GCS Director of Human Resources Peter Troupos. In October 1995 Troupos issued a memorandum concluding that there was ample evidence documenting Hall's deficiencies in the three areas specified by Gooden; however, his contract could not be terminated because statutory due process deadlines had not been adhered to. Gooden then held a meeting with Hall and informed him that improvement was expected.

Later that month, Hall received a letter from then-Assistant Principal Robert Redding noting five more occasions on which Hall had been tardy. In November Redding observed Hall's classroom and gave him low scores in many of the evaluation areas. In the subsequent months, Gooden observed Hall on a number of occasions and also gave him poor evaluations. During this period, Hall also failed to provide Gooden with his lesson plans and failed to attend faculty meetings. In January 1996 Hall filed another EEOC charge, alleging that Gooden and Redding were harassing him by frequently observing and evaluating him. After Hall failed to attend another faculty meeting on February 29, Gooden again recommended that Hall's contract be terminated for insubordination and "substantial inability to perform teaching duties." In May a hearing was held before the GCS Board of Trustees, and the Board terminated Hall's contract on the grounds of "insubordination and other good and just cause for termination."

Hall then filed this lawsuit against GCS and Gooden, alleging that he was fired in retaliation for his EEOC charges. A trial was held in June 2000, and at the close of the trial GCS and Gooden moved for judgment as a matter of law. Fed. R. Civ. P. 50. The district court granted the motion for Gooden, but denied the motion for GCS. The jury returned a verdict of $285,000 for Hall, and GCS

renewed its motion for judgment as a matter of law. In August, the district court granted GCS's motion.

We review the district court's grant of judgment as a matter of law de novo, viewing the evidence and drawing reasonable inferences in Hall's favor. *Mathur v. Bd. of Trs. of S. Ill. Univ.*, 207 F.3d 938, 941 (7th Cir. 2000). Our standard of review is the same as when reviewing a decision on summary judgment, except that we now have the benefit of knowing exactly what evidence was presented at trial. *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000). Our inquiry is not to second-guess the jury's view of the contested evidence, but to determine whether, given the totality of the evidence, Hall presented the jury with legally sufficient evidence from which it could conclude in his favor. *Id.* at 925. We agree with the district court that Hall failed to do so.

On appeal both parties frame their analysis in terms of the familiar burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), but we have explained that this is unnecessary when reviewing judgments as a matter of law, *see Mathur*, 207 F.3d at 942; *Massey*, 226 F.3d at 925. The only issue is whether Hall has met his burden of providing sufficient evidence that GCS's stated reasons for terminating his employment were pretextual, and that the real reason he was discharged was to retaliate against him for filing EEOC charges. To satisfy this burden Hall needed to offer evidence showing the reasons given by GCS were not worthy of credence or other evidence showing retaliation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-49 (2000); *Massey*, 226 F.3d at 925.

GCS's stated reasons of insubordination, poor classroom performance, and a tardiness problem are clearly legitimate reasons for discharge. *See Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755 (7th Cir. 2000); *Gonzalez v. Ingersoll*

*Milling Mach. Co.*, 133 F.3d 1025, 1036 (7th Cir. 1998). Along with testimony from Troupos and Gooden that these were the reasons for Hall's discharge, GCS provided extensive documentation going back to 1987 and chronicling Hall's tardiness problem, negative evaluations, and disciplinary problems. In addition, Gooden testified that he apprised Hall on a number of occasions that improvement was expected, and that he recommended that Hall's employment be terminated after he failed to improve.

Hall first argues that his own testimony at trial provides sufficient evidence to cast doubt on GCS's stated reasons. We have explained, however, that a plaintiff's subjective, self-serving testimony is not sufficient to contradict a well-documented history of poor job performance. *Massey*, 226 F.3d at 926; *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998); *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 866 (7th Cir. 1996). More importantly, though, Hall did not even deny much of the conduct described in the numerous evaluations and documents provided by GCS. When asked about his history of tardiness, he replied that GCS had exaggerated the problem and that some of the times listed were incorrect, but did not deny that he had been repeatedly tardy. When asked about his negative evaluations, he replied that he was a good teacher and argued that the evaluation process was too subjective. When asked about his failure to provide the requested lesson plans, he replied that he often threw them away after class. Hall also did not deny that he missed faculty meetings or that he failed to provide reasons for not attending. In any event, his subjective, self-serving testimony did not provide sufficient evidence to undermine the reasons given by GCS. *Massey*, 226 F.3d at 926; *Adusumilli*, 164 F.3d at 363; *Denisi*, 99 F.3d at 866.

Hall next argues that a statement made to him by Chris Christoff, another GCS teacher, at the end of the

1994-95 school year provided evidence that GCS discharged him because of his EEOC filings. During this period, Christoff was a supervisor in the social studies department and was assigned by GCS to help Hall improve his teaching techniques and classroom management. According to Hall, on one occasion Christoff said to him, "you've got to stop making waves and filing charges. That's why they're transferring you—that's why you have been transferred so many times." A statement made by an employee not in authority does not carry any weight unless the plaintiff can show that the employee somehow influenced the decision. *See*, *e.g.*, *Maarouf*, 210 F.3d at 754; *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997). Although Christoff testified at trial, neither party asked him if he made the statement, what he might have meant by it, or if the statement was an opinion, advice, or something he had knowledge of. Christoff did testify, however, that he had no power to transfer or discharge Hall, or to make a recommendation to either effect, and that he did not evaluate Hall. Christoff also testified that at the time he was assisting Hall he was not aware that Hall had filed any EEOC charges. Because Hall provided no evidence that Christoff was involved in any way with the decision to discharge him or even what the ambiguous statement meant, the statement does not provide evidence that the real reason for his discharge was retaliation rather than his well-documented poor job performance.

Finally, Hall contends that the fact that copies of his EEOC charges were kept in his personnel file provides evidence that he was retaliated against because of those charges. According to Hall, Gooden had access to Hall's personnel file and could have discovered the EEOC charges he filed while at Horace Mann at some point before he first recommended that Hall be terminated. But Hall does nothing more than speculate that Gooden may have

looked at the file and then speculates further that he therefore may have recommended termination as a result of those charges. In contrast, GCS provided extensive documentation to support its contention that Hall's discharge was performance based. Without any further evidence, Hall's conjecture did not provide the jury with sufficient evidence from which to reasonably conclude that GCS's reasons for discharging him were not based on his performance but had to do with his EEOC filings. *See Sanchez v. Henderson*, 188 F.3d 740, 747 (7th Cir. 1999); *Tyler v. Runyon*, 70 F.3d 458, 469 (7th Cir. 1995).

AFFIRMED

A true Copy:

      Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*